Good morning, Your Honors, and may it please the Court. My name is Larry Krantz, and I tried the case below on behalf of Appellant Chris McPartland. As the Court knows, Mr. McPartland was a former Assistant District Attorney who was convicted of obstruction offenses. We appeal because, principally, we contend that the trial was infected by significant and highly prejudicial evidentiary errors. Those errors were all made at the government's urging. With the Court's permission, I intend to address one of those evidentiary errors that we allege, and Mr. Weingrad will allege the other two. Specifically, Mr. Weingrad will allege, excuse me, will address the litany of prior bad acts by James Burke and the refusal of the Court to admit the government's Bill of Particulars. I will address, with the Court's permission, the state-of-mind issue. We also have raised the Rule 33 issue, and for the sake of time, I will rely on our papers for that. As to the state-of-mind issue, the Court permitted the government to elicit from cooperating police officer witnesses their subjective state of mind when they joined, when they chose to join the conspiracy. Specifically, although there were different flavors of the testimony, if you boil it down, they were permitted to testify that in their minds, when they made the decision to join, they believed that if they had not done so, the appellants would have ruthlessly retaliated against them, framing them for crimes they didn't commit, even framing innocent family members for crimes they didn't commit. That testimony was not based on actual conspiratorial conduct, alleged conspiratorial conduct by the appellants. It was the product of the thought processes, imagination, and speculation of the cooperating witnesses. But the testimony should never have been admitted for multiple reasons. It violated a panoply of rules, and in our view, was obviously unfair and frankly indefensible as defense counsel in the case. The motion, the in-limited motions where the government was given permission for that, were hotly contested, and the court agreed and allowed the government to present what we viewed as patently inadmissible and blatantly unfair evidence. Why should it not have been admitted? Multiple reasons. First, it was irrelevant. It was not probative of a fact of consequence to any disputed issue in the case, as required by Rule 401. Why was it not of consequence what the cooperating witnesses imagined in their minds might happen to them if they didn't obstruct? Well, that's because the participation of the cooperating witnesses in the conspiracy was conceded. It was conceded pre-trial by the defense. It was conceded... ...then wouldn't you need to show evidence of that intimidation? Of course. Is that not the mechanism by which the defendants participated or accomplished obstruction? Of course the participation of the appellants was not conceded, and of course the cooperating witnesses were able to testify to any conversations they had with the defendants, where the defendants attempted to obstruct, to messages that were passed on by the defendants to which there was never any evidence. The cooperating witnesses... Any threats by the defendants to if you don't join the conspiracy or don't continue to be in the conspiracy? I'm sorry, I didn't hear you, I'm sorry. I'm sorry, I'm leaning back. I was just finishing your thoughts. Any conversations in which the defendants themselves threatened to stay in the conspiracy? Of course. Down Main Street in an obstruction case is any obstructive conduct by the defendants. But here, two of the cooperating police officers who testified, Leto and Bombay, acknowledged they never spoke to the appellants ever about the obstruction conspiracy. They never had any messages passed to them about the obstruction conspiracy. So their testimony, that they believed in their minds that the appellants would ruthlessly retaliate against them and ruin their lives, was a pure product of their own internal mental processes. That is not admissible testimony. Can I ask you this? I understand your co-counsel will talk about the other prior bad acts at Burke, and presumably that will include the Oliva situation. Yes. If we were to conclude that that properly came in, I guess I'm not really sure how this would even be really particularly anything other than a harmless error, assuming it were on the court's part, to admit the state of mind testimony from these two police officers, when it was shown that, you know, and certainly that there were these efforts to engage in retribution, and particularly also to say that this photo letter covering up, or arguably covering up, or trying to cover for the previous misconduct by Burke. I guess I'm not really seeing it. This is a long trial, and I'm not seeing, I understand why you're trying to focus on this now, but it kind of seems like a drop in the bucket of all the evidence that came in the trial. I don't see how this is somehow the pivotal evidence, or anything even close to remotely pivotal, these two things. Well, Your Honor, having tried the case, I respectfully disagree. This was… I mean, Hickey, right? The whole thing turned on Hickey, and whether people believed him or not. That's 100% true. Now, you have other claims. I understand about problems with Hickey and all that, and if we were to agree, I certainly understand that you would have a claim that, you know, some of the central evidence in the case was problematic, but I just don't see how this is anything more than peripheral. Well, Your Honor, I think the best way for me to answer that is to direct your attention to the opening words of the government's summation. And they were to the effect, if you cross Tom Spoda, Chris McPartland, or Jimmy Burke, they will destroy you personally, professionally, financially, and criminally.  That was a direct reference to the testimony that we are challenging here. The government could not have made that statement. Didn't Hickey say that too? Yes. No, again, so I'm coming back to Hickey. I understand why Hickey is very central to everything. And there was testimony about Oliva saying, basically, these guys do go out and destroy people who are their enemies. And then you can have an argument about what are the problems with Hickey, what are the problems with some of these other bad act things. But I guess if you took out these two statements by these two, Bombay's and Oliva, the government could have made that exact same argument. Literally, the same thing based on evidence that was in there, which was far more central. That's why I'm just not seeing the focus here on these two guys saying those two things. Especially given the limiting instruction that the district court gave. Your Honor, the limiting instruction, respectfully, the government rode through that stop sign without even stopping on the limiting instruction. The limiting instruction was to the effect that this state of mind testimony, which Hickey also testified to, bear in mind Hickey never claimed that he joined the conspiracy after some conversations or conduct on the part of the appellants. That was never his claim. His conversation with the appellants came later. But he testified at trial that in his mind when he joined the conspiracy, it's because they were ruthless, would ruin his life, would ruin his family's life, etc. And there was evidence that they would do that to people. Respectfully, Your Honor, there was no evidence that they would do that to people. Oliva. I'm sorry? The Oliva, the cover-up letter. Your Honor, it, well, I'll let Mr. I guess just to focus on that question. So since you're separating out the state of mind testimony from the prior bad acts, if the prior bad acts are admissible, is the state of mind evidence independently harmful? Your Honor, it requires a fairly precise analysis of the prior bad acts and the challenged testimony. As to the prior bad acts, for my client, Mr. McFarland, there were two. There was Oliva and Cuff. Those were the two prior bad acts that he was accused of participating in. As to Cuff, which was years before the conspiracy, nobody was set up for a crime they did not commit. Nobody was framed with evidence. An officer's son. Well, that wasn't the claim, right? I mean, that wasn't the argument, right? The argument wasn't saying that they didn't commit it. In fact, the court instructs the jury that it was legitimate. The point is more, if you cross the powerful people, they will do everything in their power to go after you, root out some small crime, whatever. The argument that they were going to upgrade it to a felony, all these sorts of things, right? But, Your Honor, respectfully, you can't just lump it all together as well. They exercised their prosecutorial discretion in Cuff aggressively. Therefore, they would frame innocent family members, destroy people's lives, retaliate ruthlessly. There is a complete disconnect. The prior bad act. Well, let's just take the last bit. Retaliate ruthlessly. Retaliate to the point of illegality.  I don't think that was the point. I'm saying that I'm only afraid of them if they are, that they're going to commit illegal acts. But I thought the point was, I'm afraid of them, or we're afraid of them, because they will do everything in their actual incredibly broad scope of legal powers to come after me. But, Your Honor, what they said was that they... To be motivated by spite and a desire for retribution. But what they testified to was that they would commit illegal acts against them. Framing them for crimes they didn't commit. Clearly, a crime in and of itself. And so, the leap from the prior bad act, which involved an alleged abuse of prosecutorial discretion, both in Cuff and Oliva, to, therefore, they would commit a felony, obstruct justice on behalf of Burke, was a bridge too far. If the government wanted to make that argument, and it never did make a 404B argument, that is a 404B argument to claim they did X, therefore they would do Y. It would have failed 404B, because it was not substantially similar. Neither Oliva nor Cuff were substantially similar to the obstruction conspiracy. And so it would have failed 404B. And so we end up with sheer speculation by the cooperating witnesses that goes a bridge or two much further than any of the underlying prior bad acts that were admitted. And that bridge or two further, in our view, was devastating. Why else did the government start its summation on it? Would it have been permissible if they had not referred to illegality and just said, I was afraid, I knew these people would ruin my life. I'd be demoted, might be fired. Your Honor, obviously the prejudice would have been much less, but it's still inadmissible because it had no relevance. Why is it not relevant why a conspirator joins a conspiracy? Well, it's fact-specific. Sometimes it is. I mean, one of the things you do when you're charging person A and B on trial with a conspiracy is you have to prove they conspired with other people. Correct. And these are charged co-conspirators or uncharged co-conspirators that matter. They're alleged co-conspirators. It seems like the jury deserves to know why these people acted the way they did, what was in their mind, and you are free to attack them, rip them to shreds on the cross-examination, which, by all appearances, was very vigorous. But it's up to the jury then to decide. But why would the jury not deserve to know what was going on, what were the motives, what was going on in their minds, why they did these things, and then for the defense to argue that it was nonsense. That's what the trial's about. Your Honor, of course it's fact-specific what the jury should and should not hear. But in this case, the state of mind that was relevant was that the co-conspirators joined the conspiracy. Why is that the limit of it? I guess I'm not sure. Why is it that the jury only gets a limited picture? You get to know they joined, but, ladies and gentlemen, you don't need to know why they joined. It's preposterous. The jury deserves to get the story of what the co-conspirators were saying and doing and thinking. Well, first of all, it was unchallenged. It was conceded. It was also fairly obvious that— You don't get to constrict the story. You don't get to tell the government that they get to limit the story that the jury gets told just because you're going to concede it's sanitized.  was not a part of the story because it was not a product of any obstruction of conduct. It was a product of history, allegedly, from years earlier with disconnected acts. Of course, if it was the product of their conduct, they should testify. But it's a product of context, including the context generated by prior acts of the charged defendants. But, Your Honor, respectfully, within bounds, I understand your argument. But when you are dealing with inflammatory evidence of this consequence, you have to parse out very carefully, in our view, what is the relevant state of mind for this jury in this case, and what is the basis for the state of mind that is being testified to. If there were evidence that the defendants had made statements about how they're going to destroy somebody's life, or they took some affirmative steps to do that, you wouldn't object to this evidence? No. So there isn't a link between affirmative acts they took in order to testify? That's your argument? Of course, in an obstruction case, the government couldn't get that. If prior bad act evidence came in, and in fact what happened was they did a lot in the past to intimidate people and establish that people should fall into lines, then there would be a link to their conduct, right? It would explain why officers felt intimidated. If there was sufficient temporal proximity, if the prior bad acts were sufficiently similar to the charged crimes, then it might pass the 404B test and come in. But in this case, that was not offered as 404B, it was not tested as 404B, and it would have failed the 404B test. It came in purely on the theory that what the cooperators were thinking was relevant, not to prove that it was true. The government did not claim that they wanted to prove that the cooperators were right, and all these questions go to using the testimony for its truth content. In other words, the suggestion is... But the district court gave a limiting instruction, and isn't our case law clear that we presume the jury follows the court's instructions? That's correct, right? The court did give a limiting instruction. And is it correct that we have said repeatedly that we will presume that the jury follows the court's instructions? We said that, right? In many cases that is true. There are also many cases where this court has said that the limiting instruction was insufficient and that the jury could not have been expected to follow it with sufficient certainty that we cannot reverse. This court has reversed multiple cases despite limiting instructions. And in this case, when you look at how the government argued the evidence, you can see that the limiting instruction was meaningless to the jury. And I want to get to how the government argued it, but I just want to say the limiting instruction, if you think it through, says you can only consider this evidence for the state of mind of the cooperators, nothing else. Well, the state of mind of the cooperators had no consequence in the case unless it bore on the guilt of the defendants here. Nobody was doing a referendum on why the cooperators joined the conspiracy. Bore on the credibility of the cooperators, what would have been their motives for acting the way they did, and understanding why they did what they did. The credibility of Leto and Bombay was never attacked at trial. Leto and Bombay said they never spoke to the appellants about the conspiracy. Bombay's, excuse me, Hickey's testimony was attacked, but not on the basis that he didn't really join the conspiracy. Of course he joined the conspiracy. Of course he was afraid of Burke. I mean, the reason these people joined the conspiracy was not of any moment. Bombay said Leto had participated in the assault. What was so strange about them joining the conspiracy? This was not an issue that needed to be explained, and you have to balance what is the probative force of the evidence versus what is the prejudice from the evidence, and here the probative force as the state of mind, in our view, was nonexistent. The prejudice was enormous, and how the government argued it is critical. Aside from opening on it in summation, the very first statement they made, in rebuttal, they argued that this testimony was sufficient to prove guilt. They said, we can show they corruptly persuaded. Look at what Bombay and Leto told you. They were afraid these guys would come after them. They were afraid for their families. This was the crowning blow from the government's misuse of this testimony. They're essentially saying, these are witnesses who never spoke to the appellant, ever, about the obstruction conspiracy. They're saying the defendants can be convicted because of what these witnesses thought they would do to them. That's the corrupt persuasion. They thought they would obstruct. Now, that just cannot be in the criminal law, that someone can be convicted for what someone else thinks they would have done under a hypothetical set of facts that never occurred. I see I'm way over my time. I think I've made my point as well as I can. I appreciate the consideration. Obviously, we think the errors were substantial, highly prejudicial, and we ask for reversal. Thank you. Thank you. Good afternoon. I'm Alan Weingrad. I represent Thomas Svota on this appeal. The defendants were entitled to a fair trial. There's no dispute about that. They didn't get one, and they didn't get one for three separate reasons. First, the government offered and the district court erroneously admitted evidence of 18 separate acts of uncharged misconduct by Burke, many of which were salacious and inflammatory, the vast majority of which the defendants had nothing to do with. But because the defendants and Burke were admittedly and conceitedly close professional colleagues, this poisonous evidence about Burke, this conviction of the defendants, forbear association with a bad actor. And when that happens, when trial courts erroneously admit evidence of prejudicial uncharged conduct, this court does not allow the resulting convictions to stand. This court's recent decision in Lewis v. Zong is just the most recent example of that. In the instant case, the district court found that evidence was necessary to complete the story of the crimes charged when it was not, whether it's Burke following girlfriends or dealing with their contractors or putting a GPS device on a fellow member of the department's car, that wasn't necessary to complete the story of the alleged obstruction of the Loeb investigation. The district court found lack of prejudice several times because the defendants were not involved in the uncharged conduct, which ignored the obvious risk of guilt by association. The court provided no rationale for admitting some of the most inflammatory evidence. I mean, a disgusting picture of Burke's pornographic DVD, him calling a newspaper reporter a vulgar, four-letter word, things that the defendants had nothing to do with. And that was allowed. And most critically... Well, the DVD is part of the underlying offense, right? Correct. And we made an argument under 403... The reporter, the names, is part of the reason for the wiretap, right? Like, that's part of that story. Well, it... So obviously you have a separate argument for why that shouldn't have been admitted, but it is part of that. Yes. On the first item, we made the 403 argument because, as Your Honor pointed out, it's part of the items that were sold. I mean, the probative value of showing this... I don't want to describe it. It's in the brief. Disgusting picture. It's purely inflammatory. But it was what was stolen. Understood. Sometimes, again, if you sanitize the evidence, then it takes away the immediacy of seeing how angry Burke would have been and what would have motivated him to then beat this prisoner and then the motive that would have given him to then have a cover-up of it. Sometimes if you sanitize the evidence and you just tell a little story, then the jury loses the sense of what everyone's motivations were. I mean, this was the evidence, right? There's no dispute. This was what was stolen. Yes, and they heard the description of it, Your Honor, and all the reasons that Your Honor just pointed out for why it would be relevant were absolutely undisputed. We didn't object to the evidence of Burke's conviction and sentence. There was no question it was part of what he had. There was no question he assaulted Loeb. There was no question he covered up with the other officers what had happened. It was completely not in dispute, Your Honor, and that was the 403 argument. What's the probative force of going beyond that and bringing out all this salacious, vulgar conduct by Burke? The evidence was salacious, and that's the thing. When the evidence is salacious and those are the facts, then sometimes you just have to live with what the facts are, and you don't get to sanitize them for the jury. That's the same rationale in which courts routinely exclude evidence that, for example, in a murder case where there's no issue about the murder, that it took place, you know, courts have discretion under 403, and they exercise it to exclude particularly gory, graphic crime scenes. This wasn't that gory. It wasn't nearly that gory. I mean, the picture of the DVD, which was displayed on a several-foot-large screen in the courtroom, was disgusted. This is a very narrow piece of evidence, and maybe we should not focus on it, but in this particular thing, wasn't there a testident lobe called Burke a pervert, and wasn't there a rumor that Burke was involved in child pornography, and so knowing what the nature of the pornography was clarified that testimony? Yeah, I think the evidence became clear that it was adult pornography. I don't think the government ever even claimed that there was an assertion of child pornography. I understand. But maybe we can talk about the larger picture. So I have this larger question, which is the government's theory of the case seems to be that Jimmy Burke had, you know, ruled by intimidation, and the defendants backed him up on a number of different instances so that people knew that if you crossed Burke, they would come down on you, and that necessarily involves showing those prior acts in which they established that principle. I understand you might dispute that, but if in fact that is the way somebody is conspiring to obstruct justice, wouldn't that require evidence of that act? Well, the first answer is I adopt my co-counsel's argument about why that evidence, going to state of mind, was not admissible at this trial for several reasons. I won't repeat that. But then the other part of it, it becomes a balance. It becomes a proportionality review. The number of examples of where the defendants were charged with personally participating in the underlying conduct in question basically came down to Cuff and Oliva. And in each of those cases, there are several reasons why that evidence was not admissible, either with respect to Cuff, Mr. Spoda's alleged involvement in prosecuting or allegedly considering upgrading the charge against his obviously guilty son for gun possession was based on unsubstantiated, double hearsay speculation by the government's main cooperator about something that never happened. But the government went well beyond that. I mean, Cuff's demotion. He testified about losing several hundred thousand dollars of retirement benefits. The record doesn't permit me to talk about the jury's reaction, which I saw when that evidence was introduced. The defendants had nothing to do with that whatsoever. Nothing. So that doesn't go to show what the defendants were willing to do to support Burke, same with Oliva. Let me make sure I understand the Cuff evidence. Burke has an episode with Cuff when Cuff was in internal affairs in 1993, and that leads to Burke having a grudge. And a decade, maybe more than a decade later, is the incident with his son. And the connection of your client and your colleague's client to that episode, other than the testimony of Hickey that maybe he would have been involved in upping the charges, is the evidence of laughing on the phone, also from the government's cooperator. Correct. That's basically it. And the demotion is another decade in the future. Correct. And there was no evidence that the defendants had anything to do with the demotion either. So I'm not here to defend Burke and all the various acts of misconduct he committed, but at this trial, of these defendants, what the government needed, and with respect to the vast majority of these other acts of evidence they lacked, was a connection to the defendants so you could fairly impute to them a shared desire or motive to retaliate against people who were cooperating against Burke. They didn't have it. And the accumulation of all that evidence was, as my co-counsel said, it was impossible to defend that. There's no question that, given the magnitude of the evidence, given the quality of that evidence, and as your Honor pointed out, and I agree with you, this case came down to the testimony of a single accomplice witness with many serious credibility problems. I don't say that to make a sufficiency challenge. We're not making a sufficiency challenge. But when you assess, certainly under 403, and as a matter of harmless error, whether all of those bad acts of Burke, most of which were unconnected to the defendants, should have been admitted, you have to look under harmless error law. Well, what was the strength of the government's case? And it wasn't strong. Without Hickey, they had no prosecutable case. Period. Now, coming to the other act evidence, the Olivia stuff, I mean, there is specific testimony that McPartland references Olivia in what Hickey construes testifies as a threat that should be communicated to the others. It seems to me that there's got to be a permissible basis for going into that to explain, from the government's perspective, that evidence. Agreed. And we do not dispute, on appeal, the admissibility of, let's say, enough about the Olivia case so that the jury had proper context to evaluate the alleged statement at the June 4th meeting where someone invokes that case. Granted, right? But it was admitted. A trial went far beyond that. It became a mini-trial, all about the Olivia case. Should they have wiretapped it? Should it have been up for four months or should it have been sooner? Should they have used alternative investigative techniques? And on and on and on. And again, to the extent that that evidence was used beyond... What do you say should have been admitted? The bare facts of what happened instead of suggesting that it was inappropriate or being used as retaliation? Well, what should have been authored was evidence that he was prosecuted for these offenses by the DA's office. He had to plead guilty. He lost his job. And later, McPartland referenced that by saying you might be Olivia. Right. Well, you can be Olivia. You can be prosecuted, too, if you're the case. So you're suggesting that you would have argued only for the exclusion of those aspects of the Olivia investigation that suggested some bad purpose or desire for retribution on the part of the defendants? I mean, that takes it all out of context. You just said that you would be fine with him saying it was a legal wiretap and he was prosecuted and he was convicted for something. Are you suggesting that any... All the evidence suggesting that they privately had an ill motivation for the whole thing? Well, it should have been excluded. No, and the jury could have drawn that inference from the evidence that Your Honor has just described. In other words... You think that all could have come in? In other words, as Your Honor said before, that was all legal. The wiretap was legal. The prosecution was legal. The man was guilty. But I'm not understanding then because if only the evidence came in that it was all properly done, why would you... But you were saying it would be okay for a jury to infer that it was done for ill motives. Why would it be impermissible to have direct evidence of the ill motives? No, what I said was the jury could properly infer from the statement at the June 4, 2015 meeting, right, that essentially the Oliva case was being invoked at that time as a threat which was admissible as evidence of obstruction. That's why we didn't... That's why we're not disputing on appeal the admissibility of that portion of it. But the government went well beyond that including arguing that solely for purposes of the police officer's state of mind. And again, I won't repeat my co-counsel's argument for why that was not an independent basis to admit all the other evidence as it was admitted at this trial with respect to the prosecution of Oliva. But what if the underlying fact was it was an appropriate wiretap completely on the up and up or it was done for vindictive reasons? Doesn't that go to the seriousness of the threat that they were going to... You were going to be Oliva'd? I would submit not. It's a threat to say that if you cooperate against Burke you're going to get prosecuted. That seems more than sufficient to convey the threat. And we didn't make any argument to be different at trial if we said, oh, that was just an idle comment. You know, didn't really mean it. Wasn't meant as a threat. We were just reciting the procedural history of the prosecution of John Oliva. We didn't make that argument. The argument was very different. The argument was, that didn't happen. That was the essence of our defense. Very single-minded. What Hickey said that Mr. Spoda and Mr. McPartland said was not credible, was not true. They shouldn't believe it for all the reasons we argued. That's what the case was about. All of this unresonance was basically prejudicial filler. At the trial, much of the trial, not all of it, Your Honor, but much of the trial, more than I think, Your Honor, was describing this several minutes ago when Mr. Prince was arguing, but much of this trial became a referendum on Burke's life and career and his misconduct and the fact that our clients are associated with him. And it can't be, we submit it cannot be, that a limited instruction at the end of that avalanche of evidence and the government's misuse of it in its closing argument eliminates that given the magnitude of that evidence, the inflammatory quality of that evidence and the government's emphasis on it during trial. Can I spend one minute talking about the bill of particulars? I've been very generous with all counsel. Thank you. I'll probably pay for it later. I'm sure you will. The second, I'm not going to talk about the third error, which was Mr. Prince's argument, but the second error was that the government completely changed their position on whether the number one most exculpatory witness in the case, Emily Kahn, whether she was actually a co-conspirator in on it or not. And they changed their position. Can I cut right to the chase? Because I think I know what your argument is. Let me ask you this. Yes. Obviously, at a certain point, you raised the argument and then the government, I guess at the urging of the district court, made clear its position on rebuttal and said, it's our position that Constance is not a co-conspirator. So I guess I'm not sure what is the evidentiary value or what exactly is the thing that you thought you would have achieved by putting in the bill of particulars that is distinct from the value you derived from getting the government to concede on rebuttal that she was not a co-conspirator. Well, yes. So the government's effort to sort of put the toothpaste back in the tube doesn't work because the key part of the sequence of events, Your Honor, was what happened from before trial to when the government summed up. And what happened is Emily Constance was not a co-conspirator. She was not involved in the cover-up. And then what happens after she shows up as a government witness and provides material exculpatory evidence, the number one key witness for the defense, period, is the government now says in summation twice in order to attack her credibility and salvage their case because Higgins certainly has a whole boatload of problems, is to say she was in on it. She was a criminal too. Could you just describe the difference in value between your introducing the bill of particulars and the government's concession? Because as I understand it, had you been able to introduce the bill of particulars, you could have said, ladies and gentlemen, the government has conceded that if you look at this document, she's not a co-conspirator. Instead, you had the statement by the government in the rebuttal. So I don't see what the evidentiary difference is unless you just wanted to sort of have a gotcha moment in front of the jury to say don't believe the government now. No. What's the difference? The difference is the fact that the government changes their position from before trial, she's not involved, to after her testimony. So then after her testimony, let's assume, hang on, let's assume for the sake of argument, they take this position of the bill of particulars. Let's not say it's Emily Consonant. Witness X comes in. They have a list, pre-trial, who was the co-conspirator. And then some witness comes in and testifies at trial and says, by the way guys, I was a co-conspirator. Would you say in those circumstances that you could then introduce the bill of particulars and say hey, the government can't argue this now. They can't argue based on the testimony that was served by trial because they took a position before they heard her. Is it your view that in the abstract, in my hypothetical, and again, I know that's not the facts here, that a party cannot change their view based on the evidence that comes out of trial? We're not saying. No, no, no, it's my hypothetical. The answer to the question is they can do what you just said, but that's not our argument. Our argument was not they can't change their view. Our argument is if they change their view, the jury is entitled to know that. That's what G.E.F. Forbes says. And then it's up to the jury to decide what weight to give that change or not. The fact that after we waited and... And when they said that we haven't changed our view, why do you get to say they have, don't believe them, they really have changed their view? But they only changed their view because we got up in summation and essentially tried to kind of call them on it, you know, and we made the motion, which frankly was denied for just most especially the district court incorrect reasons. It was obvious. It was obvious. It was an inconsistency. It was timely. It should have come in. The government knew that. And so they tried to put the toothpaste back in the tube, losing our ability to do what G.E.F. Corporation says we can do, which is give the jury the other side of the story and then let them decide what weight to give it, and they can decide whether given all that evidence she was a co-conspirator or not. You've been very generous with your time. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court, my name is Justina Gerasi. I'm an assistant United States attorney in the Eastern District of New York. I represented the government in the district court, and I continue to do so here on appeal. Your Honors, the defendants were not convicted of obstruction and witness tampering because of their co-conspirator, James Burks, bad reputation and past misdeeds. They were convicted because there was ample direct evidence of their guilt. And they're now asking this Court to ignore that evidence and focus instead on this other act's evidence, which, although relevant, were all peripheral. Could you address the cuff evidence and its significance to this case? Yes, Your Honor. With respect to the cuff incident, I think the most pivotal piece of that, frankly, is it is the moment that James Hickey was brought into the inner circle. It is the moment where he, frankly, joined this conspiracy. They started trusting him because of what he did there. It's important to show their motive, what they're out to do, which is hurt their enemies and help their friends. It shows the nature... What did Hickey do that brought him into what you're calling a conspiracy? He told them that he saw him crying. Yes, Your Honor. He called initially James Burks to report that Cuff was crying in his office. James Burks then said, wait, I'll get Chris and Tom. He saw Cuff crying in his office and reported that back to Spada and McPartland shows what about the later conspiracy. You said it shows him joining the conspiracy. When did that conversation happen? That conversation definitely predates the conspiracy, but what I meant by that is substantially, Your Honor. When did it happen? I believe it was 2005. He was joining the conspiracy or just entering into a relationship of trust with the two because it wasn't the allegation or the evidence that he was promptly promoted and that Hickey's understanding was that he was being promoted largely because he had reported Cuff and demonstrated his loyalty. That is all correct, Your Honor. It's not the joining of the criminal conspiracy that is charged, but becoming part of what they call the inner circle, the people who Spoda, McPartland, and Burke trust. And it was more than just the conversation of reporting it back. It actually turned into a S. Cuff kind of moment where they were all laughing together. They were all happy about what he was saying and he joined in on that. And they took this to be a show of loyalty. The appellate's argument here is that the really state of mind and background to the conspiracy evidence came to dominate the proof at trial. I guess I'm having a little difficulty not understanding why this was necessary as it's just background to the conspiracy? I think it's more than just background to the conspiracy, though it's certainly that, Your Honor. It certainly shows the genesis and the nature of the conspiracy and how they interact. But it really, I think, shows something that... You keep saying this word conspiracy, but you don't actually mean it's part of this conspiracy to obstruct justice. You just mean that they all talk to each other, frankly, about getting back at people. I'll stay off that word and just say the genesis of their relationship, the close relationship and the nature of the relationship. I think... And the relevance of that related conspiracy is what? That they talk frankly to this person and so therefore you should trust his testimony? I think it's the idea that he now, with them, is in the same... They're in the same mindset. If it's an enemy of James Burke, who Cuff was, we are going to be happy when he is downtrodden. We are going to look to hurt people. And there was nothing criminal about the Cuff incident that Hickey reported. There was jury instruction that made very clear that the district attorney's office acted properly there. There was no issue. But it's this notion that now James Hickey is in the inner circle, the people who see Burke's enemies and help Burke to stay in power and help to keep the triumvirate in their positions of power. This atmosphere of fear and retaliation... It's not an atmosphere of fear and retaliation because it's just a meeting among the people that you say are in the inner circle. It's not like they did anything externally. I guess that's separate. You would say, well, there seems to be some indication maybe they tried to increase the charges against Cuff's son. Your Honor, it's this idea that he had a target on his back. Certain people who were Burke's enemies had a target on their back. What was the evidence? Is there any evidence that the appellate peer had any role in considering increasing the charges? The charges weren't increased. They were not, Your Honor. James Hickey testified, and I think this is correct to say, that the only people who could do that were the district attorney's office. The person in charge of the district attorney's office is Tom Sota. The choice of the charges and the target of Cuff, where everybody knew that he was an enemy of Burke, everyone sort of... This is well known. I mean, this is something that we have to do. There's no evidence that they actually did anything. No, but they were certainly happy about it. There was evidence about that. That's evidence so that the connection of these two defendants to that episode is a conversation in which they, according to Hickey, took glee in another man's trauma. In a specific man's trauma, meaning an enemy of Burke's trauma. And Hickey's show of loyalty was thereafter rewarded. I mean, he took that as a very clear reward for what he did. Isn't that very different from the conspiracy that you're talking about that happened later? Isn't just being happy... If they do nothing inappropriate, but they're happy that somebody they don't like is suffering an adversity, isn't that very different from a conspiracy to actually obstruct justice? It is, Your Honor, and that's why I actually do think that the 4-3 analysis here weighs in the government's favor. This was lawful. There was nothing inappropriate. There was no illegal behavior here, but it does show this atmosphere that they created and the way that they worked together and the nature of the raison d'etre of how they operated as a unit. If everything was lawful, does it show something about the external atmosphere? It really only shows something about their internal workings. I think it shows both, Your Honor. I think it shows their internal workings, but the fact that this happened did not stay limited to those individuals who witnessed it. All of Suffolk County Police Department was aware of what happened to Kass and knew why it happened. When he got demoted, everyone said, Oh, we know why that happened, too. It was an enemy of Burke. Burke holds a grudge, and the people who are helping Burke are the two defendants. It was not secret. It was certainly among these individuals to elevate Hickey to the inner circle, but it didn't stay there. Everybody knew why it happened. Everyone knew why Hickey got promoted after that, and so I think that fact resonates and creates this atmosphere of fear that Suffolk County was really in, that the Suffolk County Police Department was operating in. It was primarily driven by Burke, right? It was Burke who hated the guy. It was Burke who was happy at his unhappiness and who later demotes him and wants to know who's at the retirement party. All that could be very, very probative that there was an atmosphere of intimidation in the Suffolk County Police Department, but in this case, the only connection to these two defendants is the one conversation, the phone conversation where they're laughing. I think that the connection that is even more important than that, I mean, there certainly is that phone conversation, but the more important connection is them now inviting Hickey in. It wasn't Burke alone who invited Hickey into the inner circle. It was the three of them, and it started here. And wasn't the circumstance of the call particular? As I recall, wasn't it something like Hickey called Burke to report on this, and he said, wait, wait, let me get these two guys on the phone? So the question is, as soon as he's learning this piece of information that one of his enemies is suffering, the two people who he brings into this are splitting them apart. It's not like they happen to be in the same room when Hickey walked in. But the notion that Burke would choose out of all the people in the world to call, it would be these two. That's exactly right, Your Honor. But that is evidence then of background to the conspiracy, illuminating the relations among the co-conspirators a decade before the conspiracy began. Yes, Your Honor. I mean, the fact is, if you take a step back, you have a district attorney who's in power for 15 years. This is a long-term power structure that operated together for a long time. And the way that they operated became well-known. And these vignettes, how Hickey became part of that inner circle, what happened to Pat Cuff, what it meant to be John Oliva, every person in Suffolk County Police Department knew what it meant to be John Oliva. And that happened right in the center of the charged conspiracy, which they also took. The timing was meaningful to them, too, because now it's like, okay, they seem to have beaten the federal investigation. What does it mean to be John Oliva? So you just said that everything... Oh, we were talking about Cuff, but let's talk about Oliva. So what does it mean to be John Oliva? There's no contention that the wiretap wasn't proper, right? Yes, Your Honor. So John Oliva just means something bad is going to happen to you, right? Is that another case of them taking delight in something happening to someone they don't like? Or is there some evidence they did something inappropriate toward Oliva? So there was no evidence. It was made very clear through instructions that the wiretap was lawful and that their actions were lawful as far as the charging decision. However, there was very clear testimony that the wire served a dual purpose. The wire was, on its surface, to try to figure out who was the responsible person for these leaks. However, it served another more nefarious purpose. And that's when you see the defendant's role in it. It was specifically done to listen to what the feds had on Burke to see if who was cooperating with respect to the investigation that they were just told was closed. They wanted to see who were the cooperators, whether it was still going to be opened, what the feds knew about Burke, and they were so interested in this wire. And there's tons of testimony about that. The two defendants, Your Honor. The wire room was literally located just a walk away from McPartland's office. That's the only time that that room at the Suffolk DA's office was ever used as a wire. It was just for that. McPartland was there just about every day. Spoda, the sitting district attorney, was in there quite a bit. They all together, as soon as the word Rickenbacker came up, gathered around to listen to that call. So this wire served a dual purpose. We did not allege that it was unlawful anyway, but there was another purpose to it. Did Hickey testify that it served a dual purpose, or are you relying on the circumstantial proof surrounding where the wire tap is and their interest in it? The best witness on this, Your Honor, was Moustakis. He was the ADA who was assigned to the wire. McPartland wrote it. He was part of discussions with the defendants where the idea was, you know, F. John will leave us. I'm sorry. Go for it. Why don't you finish that. I was just saying that Spiros Moustakis is frankly the best witness on this. He made very clear that this wire had a dual purpose. He made very clear that the defendant had a keen interest, unusually keen interest in the wire. So the defendants had an interest in it, but did anything, did it accomplish a dual purpose? Did anything happen from them finding out information that's not related to the purpose of, the lawful purpose of the wire tap? As far as I could tell from what we have in the record, I don't think they got information on the federal investigation, but they were trying to, and they certainly were listening to, they were, the monitors of the wire were instructed, and you've got this from Spiros Moustakis' testimony, were instructed to listen when Burke's name was mentioned, when anything involved in Burke or Tonya Lopez, the Newsy reporter, they were told to listen to those things. Now that's not the purpose of the wire. Your monitor is supposed to listen to what the, you know, purpose on paper of the wire is for, which is supposedly for leaks, and instead it turned into something else. Well, the reporter is the, related to the leaks. Oh, I'm sorry. I guess I meant more the Rickenbacker piece and what the feds knew about. But, you know, they were instructed to listen sort of beyond what the scope of the written wire was, which, again, this is from Moustakis. This is why he believed it served this dual purpose. Could you just explain the relevance of putting on the evidence of Cuff's demotion and the activities about the retirement party? I think that was, Your Honor, that's just the continuation of, sort of, or the end of the Cuff story. The, the, the retirement party was the, I'm sorry, the demotion party, I should say. When you say end of the Cuff story, I really want to know the relevance. The beginning of the Cuff story was explaining the moment at which Hickey is introduced into the inner circle. So, how he came to know his alleged co-conspirators a decade before the conspiracy. And, Your Honor, the, there wasn't much testimony, frankly, about the demotion party and the, the fact that he was demoted. It was a reference here and there, just to be clear. The demotion party, the testimony was clear that Burke and the defendants had a demotion party for him. When that happened, they, not for him, that's the wrong word, they celebrated his demotion, the three of them. And, in general, the testimony with respect to the fact of his demotion came from, like, a line here and there of just the fact of his demotion. It wasn't harped upon, it was just, sort of, what ended up happening to someone who Burke had put a target on his back years before. And they participated in, the two charged defendants participated in the demotion celebration? Celebration, yes, Your Honor. But what is the relevance of that? It's really just the, the notion that this is how, I'm, I'm not going to use word conspiracy, this is how the triumvirate operates. They, they are, they try to, I mean, I'm just trying to understand the proof and getting to understand it better. When people are charged as members of the conspiracy, I mean, rule, that doesn't mean the trial can introduce every aspect of their, of their relationship under the rubric of this all goes to background of the conspiracy.   so what about the, what about that evidence? How is it relevant? Again, it's the celebration of how a, a, a, a, a, a, a, an e YA hav. An enemy of Burke became an enemy of all of them. The celebration of his demise, really, his, his fall from grace was something they all, they all participated in. The two defendant s participated in that, they enjoyed that. It really goes to show sort of, not the relationship among the three of them, but what's the purpose of their consolidation of power was. They, they all wanted to keep Burke in power. They wanted to keep him happy, keep his enemies at bay, and this is just one, one of the things. Because they celebrated the adversity that Cuff faced at that time, it's more likely that they would have prevented the FBI from investigating the Loeb incident? No, that's, that's where I, I think that because of the nature of these, you know, this is not a crime, it's not a crime to celebrate somebody's, you know, unfortunate demotion. I do think it's But you're just saying it shows the purpose of their relationship, so just looking for the connection between that and what happened later. So it shows that they're always acting to protect each other, and so therefore the fact that they celebrated the Cuff demotion means that they were more likely to cover up for Burke later on, is that right? I think it's more that they were willing to go to great lengths for Burke. And this is just to be clear, Cuff was not just a random enemy, right, but he was someone who, the testimony was showing, was an enemy of Burke because he had investigated Burke with respect to allegations of police misconduct. That's correct, Your Honor, that's the Rickenbacker. And this whole case was about Burke committing police misconduct, right, beating somebody, and then they're being empowered. So Cuff was not just a random person who Burke disliked. That's right, Your Honor, and that actually ties into why the Rickenbacker piece even came in to begin with, for that purpose as well as to show, I think, that     he was someone who was an enemy of Burke as a private attorney in connection with those IA  So there wasn't a great length for Burke which was the motive to do a cover-up later. Is that right? It's motive? It's motive and sort of modus operandi in general of what they're trying to do and how they operate, how this group operates, and frankly it would have tough accounting. What about all the evidence about Burke that is not connected to any of the defendants? So Burke tailed his testimony to the defendants, right? Your Honor, those incidents do not and I will say, again, compared to the 30 plus witnesses we had at trial, this testimony is a couple of lines from one or two witnesses. There's no way that could have overtaken this trial. That's just too much of a stretch. The GPS device on the cars is actually interesting because that did come back with respect to Christopher and Burke's meeting. They were checking underneath their cars to see if there were bugs. Burke had his car during the course of the conspiracy and swept for his car. This is how he operated and he assumed if someone was investigating him, this is what we should find. It became their paranoia. They were paranoid that someone had put a GPS on their car. He and Burke are paranoid because that's how they operate. The fact that they're paranoid about it shows they want to put bugs on someone's car. It was to explain where this came from. If you didn't know this is what they did. The fact that Burke put a bug on someone's car, why does that explain why they're worried about it? That wasn't about them. Hickey was testifying as to that. I think it was also during one of the meetings at a church. We didn't tie that together in that way. What we did was try to explain that this is the kind of actions they took. When Hickey testified he was anxious and ended up in a hospital. He was crazy that there was a bug on his car. This helps to explain why he felt that way. This is really just such a small piece of the evidence. I don't think we ended up closing on it. It was tied into his testimony. I even went through and double checked how many witnesses there were. We elicited testimony about the cuff incident with his son from only two witnesses. Several other witnesses mentioned the fact that he was an enemy of Burke. We elicited testimony about five witnesses. That was more central because it wasn't just one witness. We had maybe 35. Can I ask what the other evidence is? If you were to put aside the bad act evidence, what are the acts that the defendants took in the obstruction of justice conspiracy? We have testimony from Hickey. Hickey seems to say of Spada that Spada would often call and say how are your guys holding up and things like that. Is that the obstruction conduct? It was numerous meetings and conversations that occurred over the span of several years while this was going on. The structure of this was that Hickey was specifically directed by Spada to keep his guys in line. How are they holding up? Are you worried about any of them? At one point there was a meeting in Spada's office. The only communication that Spada has with Spada is through Hickey. That's the nature of the way he did to obstruct justice. That's the way he communicated to them. The detectives knew where the message was coming from. In fact, even Lito told Hickey tell them I'm not going to cooperate. I'm going to toe the line. He tells Hickey make sure they stay in line. He communicates to the officers. So that's how he accomplishes this. There's a pivotal meeting towards the end of the case, really, where they're in Spada's office. Spada says flatly Bombay is a rat. He'll say keep those guys in line, make sure they don't cooperate. That's where that all comes to a head. But there's a buildup there. They say that, but at that point, everything has already come crashing down. He testified to this. The chief of the public corruption bureau, the chief of police, I am completely screwed. At that point, though, the subpoenas were about to go out. It was almost too late at  So he said he gave up. This is all in context of multiple other conversations about cooking up a false story for work to put  There's a whole number of conversations happening all at the same time. They're all consistent with one another as to uniformly each member of the conspiracy advancing the same plan, which is to give a false story and to basically otherwise clam up and not cooperate. That's correct. I was focusing on Spada, but Ms. Portland was the architect of the false narrative. He was vetting it. So Spada's obstruction is he tells Hickey how your guy is holding up. Ms. Portland, I guess, moots Burke for his meeting with the FBI. Is that right? Yes. And I believe he also assisted with Lito. Lito had to testify in the state proceeding. But again, this is years of they also had meetings separately from Hickey. She talked about meetings. As soon as the first set of grand jury subpoenas in 2013 hit, Burke turned a blind eye to Hickey. I'm asking what is the evidence of affirmative action they took. They are through Hickey. He's the conduit. He's the conduit to keep those guys in check and make sure they adopt this false narrative. They knew they couldn't say anything. If he just said I hope your guys are doing okay, like the stress isn't getting to them or something, that would have been fine. But the fact that he said keep them in line, it communicates that he wants Hickey to urge them to misrepresent what happened. It's not just one time that  keep them in line. He felt the pressure mounting. It culminates in the June 4th meeting. It's there from the beginning. The events do happen. You see them in the calendars. He took contemporaneous notes when this was happening. That's the most direct evidence of the trial. In our rebuttal, we set forth about 20 different pieces of evidence that are independent from Hickey that would make no sense if it didn't happen the way we said it happened. There was a slide on this. It talks about the phone records, who Jim Burke called on certain key days, the calls among the conspirators when the grand jury subpoenas hit. Why the low case at the beginning was assigned to McPartland and it was a car-breaking case. Why wasn't the case transferred to a major case? Why was the prosecutor not appointed as a special     appointed as a special prosecutor and there was a handpick from Spoda two counties away. There is testimony that they didn't want to take on special prosecutors. There is testimony that they  want to take on special prosecutors. There is testimony from the chief of appeals who said I was told not to write the order more broadly. This prosecutor is only going to focus on the lobe theft. There are emergency meetings at the Spoda office. Why are they having a meeting? Why do they have to leave their office and go to his house? Another co-conspirator did not testify. Why is he being asked to keep tabs on these witnesses? You can see it for yourself. I know I'm way over time. That is not true. There is evidence that only makes sense if the conspiracy operated this way. If you would give me a moment to address the bill. It is literally a list of charged conspirators. She was an adverse witness to the government. We never argued that she had any criminal exposure. The court invited the defense to reference the issue. The government made very clear that she is not a co-conspirator. What we did say is that she is an admitted biased witness. She left the DA's office. We pointed out the bias and her convenient memory. She was at meetings for hours. She said she left. Why does that mean she has no exposure? I would suggest that if I did suggest that, the defense would say that is not how conspiracy works. She said I was there. I heard everyone being upset and concerned and then I left. I remember everyone was upset and concerned. If I knew that Burke assaulted Loeb, I would have told somebody. There is no evidence to suggest she had any exposure at all. She said she left. We put her on the stand. She said that. She said all she remembers is people being upset and consoling Burke. That is where it ended. Thank you, your honors. I am  read the argument that I brought back to the government. I am brought back to what   for five weeks. Which is the government completely blurred the line between the charge and the charge itself. And that is the charge conspiracy and the relationship of Burke, Spoda, and McPartland. When he misspoke and said that he joined the conspiracy at the incident. Ten years before, eight or ten years before, Loeb was even assaulted. That is the mindset with which the government tried the entire case. What they put on trial was what they claimed was a corrupt relationship. Going back 10 or 20 years from McPartland, maybe longer from Mr. Spoda. And they did that to deflect from the fact that the actual proof of the conspiracy was the responsibility. That's it. It would have been a short trial, but instead we had 30 witnesses because the relationship was put on trial. And the government argued in summation, and this was the fruit of their blurring the line. They said to Mr.  you have no testimony about what that call was. They talked all the time on the phone. And the government argued, you know he told McPartland in that very first phone call that he beat up Lowe. And you know that he asked for his help. This was out of thin air. It only could be argued because their position was the relationship was corrupt and therefore he must have done that. That is quintessential propensity evidence. You don't need actual proof he did it. He had the propensity to do it because of his corrupt relationship. And we spent this entire trial or the bulk of the trial battling the corrupt relationship narrative that the government tried to put everything in. The whole story. Thank you. Three quick points if I might. First, the issue here with all the other bad act evidence was not just Cuff but the evidence against Mr. Sponer was thin, old, and overshadowed by several other acts against Cuff himself but he had nothing to do with. It wasn't just Oliva. It was the whole other long litany of other irrelevant evidence that was allowed. 15 witnesses testified to that litany going back over 20 years. This court particularly in the Williams case made it clear what the issue was. It was far beyond what was necessary to prove what was at issue in the case and that the district court allowed that to happen. That's the reversible error. Second, to the extent that the government has argued Mr. Hickey and his testimony and his credibility, with respect to Mr. Spoda, it came down to numerous conversations that he said he had on the phone and whenever he saw him where there was documentary evidence including concessions from Hickey himself that put the lie to that. Spoke to him on the phone all the time, evidence of one phone call in eight years. And the list goes on and on. So there's no issue that his credibility was in serious dispute and that's why all the other bad act evidence against Burke was so prejudicial and created the unfair prejudice and danger of conviction on an improper basis which was guilty by association. Finally, with respect to Mr. Thompson, it's just not credible most respectfully to argue as the government did. They specifically told the jury that she was and they said it twice. First meeting they had, they all knew he did it. They are conspiring to cover up the assault. Second meeting, two years later, specifically talking about Ms. Thompson and her version of the case, they are covering up. That's part of the cover up. So it is simply not credible and incorrect to conclude that the reason we were not allowed to introduce the bill is contradicting that argument and so the government never made it in the first place. Thank you. Thank you all. We will take the matter under